Good morning, Your Honor. My name is Anthony Pruszynski, and I represent the appellant, CHMM, in this case. I'd like to reserve one minute, just in case, for a rebuttal, which I may or may not use. There are two prevailing issues in this appeal. One are the many glaring errors in the district court's failure to abide by Rule 12b-6 standard, leading to a misinterpretation of the shipbuilding contract involved in this case. I presume you understand the facts of the case? Oh, yes. Okay. The second issue is the court's misconstruction of Supreme Court precedent with respect to other property damage, in particular the Saratoga fishing decision. In this case, the district court didn't follow the 12b-6 standard. It must accept the facts pleaded by the complainant as true unless controverted by undisputed facts in the record. The court misinterpreted a large part of the contract. It had it before it, and it engaged in inappropriate fact determination before a full record could be developed. This is very important. This motion was filed one month after the complaint was filed, and we mentioned this to the district court in the hearing, that a lot of things we didn't know yet because the ship was built in Germany by a German shipyard. We are engaged and have been engaged in an arbitration with them on the same issues, the failure of the door. And we said that we would need discovery, we'd need to get information from the shipyard, but that seemed to pass by the court. The court disregarded basically the fact that, as the contract says, our client purchased a bare ship from the shipyard and was fully responsible for the interior outfitting of the ship, which was what was damaged in this casualty. And the court basically disregarded this, left that aside, and shuffled disparate contract terms to facilitate a result-oriented determination, as best as I can see. You know, you're getting a little value-laden in your argument. Maybe you could step back and put it into the context of the law. The dispute, as I understand it, is whether the ship, when it was launched or released into service or into the stream of commerce, as it's said, it was a fully intact ship. It had the interior component, it had the door that failed. So in order for the interior portion to be another property, you have to explain, at least to me, where's the breakdown in the court's analysis? Okay. I think one thing you should remember is that the court did not have before it the entire contract. The court had before it the body of the contract but none of the schedules. The table of contents of the contract is at page 126 of the record and includes 11 schedules. One of the ones. Wait a minute. I don't understand. Why didn't the court have the relevant schedules? Because we didn't have it. And we eventually got it in the course of the arbitration in Europe. But there is a specification that's attached as Schedule I which specifically refers to the interior of the vessel and says the interior outfitting is, as per owner's request, not included in the yard's delivery, and that delivery refers to delivery of the vessel. There also was information that was received this summer, actually, email exchanges from end of 2009 between the shipyard and our client saying that the ship was going to be delivered without the interior installed in the beginning of 2010 when sea trials were to be conducted. None of this is in the record before you. I know. Well, that's one of the problems when we rush to judgment. Mistakes get made. But the email exchange and basically what happened was the ship did go out for sea trials in the beginning of 2010 without the interior installed, and then what happened was that the decking became damaged. Are you telling us things that are not in the record? Absolutely. It's one of the reasons why this thing needs to be remanded. I don't think that's a good idea. If things are not in the record, you really can't talk about them. You can say things are not in the record, but telling us a whole tale about things that are not in the record is confusing and improper. Okay. The point of my telling you this is that many things developed after this motion was heard and after this appeal was filed that are relevant to the initial determination and one of the reasons why the Court should not have rushed. You did not move to supplement the record with these materials. Right? So if you had done that, you could have given opposing counsel a fair chance to oppose it. We could have thought about it. But here you are at oral argument and these things are not in the record. I believe that that's fair. As far as this case is concerned, they don't exist. And you have now spent almost six minutes of your time talking about things that don't exist. So I do want you to answer Judge Fischer's question, but I just think you need to stick to the record. I hear what you say. The only reason I made that point was to say that there was a lot more that needed to be done in this case before the Court made its improper decision. However, let's go to the ‑‑ I think it's at page 13 of the record. The Court basically disregarded and shuffled ‑‑ Page 13 of the excerpt of the record? Yeah, the excerpt of the record, page 13 of the ER. Okay. Okay. And in that, Judge Stewart went through a series of contract decisions, contract provisions that don't apply or certainly don't show that the interior outfit was part of anything that was done by the shipyard. In particular, the Court said that the Court looked at the vessel of the Yardens to make sure that the vessel was delivered with completely outfitted, with documentation and class regulations having been fulfilled. However, there's nothing in the record to show that there was any ‑‑ what the class regulations were, what the state flags rules were. None of these were identified in the record, and I submit that none of them pertain to the interior outfit of the vessel.  Specifically stated that sea trials and class regulations do not impact the shipyard's obligations with respect to delivery of the interior outfit. Additionally, the Court below said that the interior outfit and other purchaser supplied items, which is a defined term in the contract, were what we were seeking to recover for. That's not true. What we sought to recover for was the interior outfit. Purchaser supplied items is a separately defined item within the contract. It also is something that is specifically referred to in the schedules, and so that's a separate and distinct thing. In addition to that, I just want to make sure that you understand that on page 31 of the ateles brief, they quote the purchaser supplied items section of the contract, but for whatever reason, they put in language that says, including the interior outfit. That language is not in the contract, and when you look at the brief and compare it to the contract, you will find that, and that should be noted. The Court also concedes ‑‑ the Court also said that the construction was a result of a series of coordinated contracts, and that also was not the situation with the interior outfit. The interior outfit was installed solely by the purchaser, CHMM, and solely for the reason of ‑‑ solely for the purpose of fulfilling its own obligations under the contract. It did not have any responsibility. VR did not have any responsibility for it, and it was plainly other property. You're eating into your own bottle time. Okay. I'll just want to ‑‑ then I've used it up. But here's what I want to say about the second part of the case, which is the Court drew a bright line as to the timing of the addition of the interior outfit by CHMM as occurring before the vessel was actually finally delivered. The vessel could have been delivered at any time with or without that interior outfit installed, and also the Supreme Court in Saratoga Fishing did not draw a bright line as before and after delivery of a vessel with respect to the addition of other property. And I believe that's my time, unless you have any further questions. Thank you. May it please the Court, Jay Beatty, appearing on behalf of Freeman Marine. Under Saratoga Fishing, the relevant product for purposes of the economic loss doctrine is the product that is placed into the stream of commerce. In this case, the product that was placed into the stream of commerce was a 195‑foot‑long, $50 million luxury yacht. Normally, when you talk about that, you deliver an item with all the things in place, doors, or like you buy a washing machine, right? You buy a door with it because it doesn't work without it. But this is not that kind of thing. They buy the vessel from the shipbuilder as a whole, and then they outfit it themselves. So that's a different case. I mean, saying it's the vessel, it's the product, that's just a conclusion. Well, it's a conclusion that's drawn from this interconnection of contracts. It's a conclusion that's drawn from the fact that the interior outfit happens to include critical components of the vessel itself, including its navigation system, its ship‑to‑shore radio. You can navigate the vessel without the interior, right? Yes. I mean, how? You can take it out to sea, do sea trials. Yes, that's ‑‑ I don't know what you do on a vessel, but you can do all those things without any of the interior stuff, right? Well, you're not going to get a past class certification, and it's not going to be able to pass sea trials, assuming that there's any sort of navigation involved. Well, there's lots of things you can't do. You know, you can't have a good, you know, swank party on it without the interior appointments. There are lots of stuff you can't do. You can't sun deck yourself or all the things. Right. It's no longer fulfilling its ultimate purpose as a luxury cruising yacht. But what did they bargain for? In this case, they got into a series of connected contracts, and they bargained for a 195‑foot, $50 million luxury yacht. Yes, but the ship builder disclaimed any responsibility for the interior package. Which is a notable point of the contract in and of itself, because the parties anticipated that when this vessel was completed, there would be an interior outfit. It would be delivered with an interior outfit, although the ship builder, the builder of the Bear Hull, was not responsible for the interior outfit. The object of the bargain here clearly was to deliver a fully outfitted vessel. Delivery would take place in international waters to avoid VAT tax. It would have passed its sea trials. It would have had its class certifications. It was a turnkey operation. It was a fully functioning, fully furnished luxury vessel. I always hate to make analogies because they tend to go sideways, but let's assume that you went out and bought yourself a fully furnished Winnebago, the Picasso model. But, of course, Winnebago sends you out to pick your own Picasso pictures. You pick out your pictures. You pay for them. But you give them to Winnebago, or you have your people go to their factory, place them into the motorhome. What you're doing, the final product in that case is a finished Picasso version motorhome. That's what we have here. When the Picasso explodes, you don't have a torque plane. Is that your point? It is the part of the product under the Saratoga Fishing Doctrine. And the reason why it's important to look at what the object of the bargain was is to ensure that the parties were in a position where they could have negotiated with one another to come up with the appropriate warranties. Did they pay the price for the – that they paid the shipbuilder? Did they pay the price that included the outfit? I mean, the example you gave where you go out and pick out your own Picasso, it's sort of like – I assume it's like picking out your carpeting or picking out your cloth and so on. You pay for the product, and then they say you've got a choice of equipment you can pick. But that wasn't the case here, right? They didn't pay the shipbuilder for any of that stuff. That was paid for separately? As I understand it, it was paid for separately. It was installed separately. It was installed by somebody else. Well, it was installed in coordination with the creation of the overall vessel. When you're getting class certification – I say separately. You're saying coordination with. So that sounds to me like you don't want to answer my question. You want to say something else. Was it installed by the German company? What was it called? No. No, Ms. Krug. It was not.  There we go. So it was installed by somebody else, right? Right. It was installed by a subcompany. But coordination, as you call it, involved after they did whatever they did with whatever contract they chose to do it, they then turned the paperwork over to the shipbuilder so they could get certified. And the shipbuilder needed the paperwork because you can't get certified unless you've got paperwork showing that you've installed the right kind of equipment, right? Right. And the contract also provides that they're to provide us with schematics of the interior outfit and how the purchasers, CHML, to provide Novus Krug with schematics of their proposed interior outfit, how the vessel interior was to be designed. That sounds a lot different than picking out the carpeting or what pictures go on the wall when you've bought a full – you know, like you buy a house and they say, well, you know, you have a choice of lamp fixtures. You have a choice of carpeting, you know, whatever. They say you have these choices. But that's really quite different from saying you turn over the house to me and I'll send in a crew and have them install it. It is different. But it's a difference that's been contemplated by the court in East River, by the court in Saratoga Fishing. In those cases, the courts recognize that most finished products involve component parts. There are going to be a number of contracts. Those cases involved the component parts being added by the purchaser, by a third party unrelated to the seller? Saratoga Fishing, of course, involved a component being added after the product was originally placed into the stream of commerce. So the court in that case created a bright line as to components added before and components added after the product was placed into the stream of commerce. In East River and Saratoga Fishing, the court said we don't determine what's a product based on nose count, based on how many contracts there are, because most products involve component parts. There are going to be contracts for those component parts. Just because there's a separate contract doesn't mean there are separate products. You look at the overall purpose of these interlocking contracts to determine what the parties intended to place into the stream of commerce. It's clear from looking at the vessel contracts. Scalia, I was listening to an answer to my question and she didn't give it. It always makes you suspicious. In those cases, was the equipment installed by a third party, not by the manufacturer? Simple question. It's a yes or no. In Saratoga Fishing, the equipment was installed by the original purchaser of the vessel and then the vessel was later sold to a purchaser. Not by the manufacturer of the vessel, right? And they said this was installed afterwards, so that's not covered by the exception, right? Right. So Saratoga Fishing doesn't help you at all. It can only hurt you. No, seriously. So you cited, what was the other case you cited? Well, East River, and that's In East River, was the equipment installed by somebody other than the manufacturer of the vessel? Well, the equipment was installed by the shipyard. The suit was against the manufacturer of the turbine. So the turbine itself was assembled by the manufacturer. There wasn't another person involved. But if we're looking at cases that are on point, I So your answer to my question is no. So we do not have a situation in East River that the equipment was installed by somebody other than the manufacturer of the vessel. That's correct. So it's not directly on point. We can infer stuff from it, but it's not, you say courts have considered this, but courts have not considered this. Well, courts have considered it. Okay, so give me a case that's like ours where, in fact, this was installed by somebody independent of the original manufacturer. Nevertheless, the exception was held to apply. The closest case that we're going to get is American Home Assurance v. Major Tool and Machine. And in that case, the insurer for a turbine assembler, the subrogated insurer, brought suit against two component part manufacturers. One manufactured in interior housing. The other manufactured in exterior housing. Because they didn't follow the dimensions given by this turbine general contractor, the parts destroyed each other along with other turbine parts. So the whole product was damaged as a result of inadequate performance of these subcontracts. So the subrogated insurer stands in the shoes of the general contractor, in the shoes of a party equivalent to CHMM in this case. It goes to sue these separate manufacturers of these subcomponents. The court said, no, the overall purpose of this contract was to create a unified whole, a turbine for later sale to another party. And because all the parties understood that, they were in a position to negotiate appropriate warranties that would cover it. That's American Home Assurance, 8th Circuit, 1985, right? Yes. It's a good year, 1985. It's a very good year. It's a, of course. But you are out of time. Okay. Thank you very much, Your Honor. And you're out of time, too. So we are now, in case that argument stands a minute, we are adjourned.
judges: Davis, Kozinski, Fisher